**Jeffrey V. DAILEY, Plaintiff,**

**v.**

**Willie LYLES, Defendant.**

**No. 90–0931–CV–W–8.**

United States District Court, W.D. Missouri, W.D.

Feb. 28, 1992.

John M. Torrence, Torrence & Wee, Kansas City, Mo., for plaintiff.

Elizabeth D. Badger, Patrick F. Bottaro, Morrison & Hecker, Kansas City, Mo., for defendant.

## ORDER

STEVENS, District Judge.

Plaintiff filed his "Petition for Damages" (hereinafter referred to as "complaint") against defendant as a result of defendant's allegedly improper actions during an arrest of plaintiff for possible violations of the Missouri Wildlife Code. Of the five counts in plaintiff's original complaint, the first two are based on 42 U.S.C. § 1983. Specifically, plaintiff claims his constitutional rights were violated because he was falsely arrested by defendant and because defendant forcibly entered plaintiff's home to make an arrest without warrant. The three remaining counts set forth allegations of malicious prosecution.

The case was scheduled for trial beginning December 2, 1991. Two of the malicious prosecution charges were dismissed by the parties before the date for trial. On December 2, the court entered a one-page order granting defendant's motion for summary judgment on all three remaining counts and indicating that an order detailing the court's reasoning would follow shortly. This is that order.

## I. Facts

Plaintiff Jeffrey Dailey is a fishing and hunting guide, taxidermist, and manufacturer of glow-in-the-dark fishing lures, living, at all relevant times, at 311 Lakeland

Drive, Smithville, Missouri.[1] Dailey also ran his various business operations out of this address, used the address as his only business address in advertisements, kept all business papers there, used the phone at the residence for business purposes, and claimed a tax benefit for operating a business out of this residence. Since 1978, Defendant Willie Lyles has been employed by the Missouri Department of Conservation ("Department"). His job is to enforce the Missouri Wildlife Code ("Code"). During the spring and summer of 1988, Lyles was assigned to the Smithville Lake area. This action arises out of confrontations these two had between April and June of 1988.

The first confrontation occurred in April when Lyles cited Dailey for having an excessive number of fishing hooks in Smithville Lake, in violation of the Code. Lyles wrote up a ticket for the violation and served Dailey at his residence. Dailey pled guilty to the charge in the Associate Circuit Court of Clay County, Missouri and paid a fine. It was during this court appearance, according to Dailey, that Lyles told him he was "going to get" him. Shortly after Dailey was served with the ticket he complained to Lyles' superiors at the Department regarding Lyles' demeanor during the writing of the ticket. According to Dailey, his complaint urged that Lyles' actions were racially motivated. Lyles is an African American. Dailey contends that Lyles was made aware of the nature of the complaint to the Department but was not disciplined or reprimanded as a result of it.

Several weeks later, Lyles and another Department agent, Kent Woodruff, conducted an investigation into whether Dailey was engaging in taxidermy without a permit, a misdemeanor violation of the Code. The agents noticed in the spring of 1988 that Dailey was running newspaper ads and publishing pamphlets promoting his "Miracles of Nature" taxidermy service.

It is undisputed that at this time Dailey did not have a permit to perform taxidermy work as required by the Code, although he had purchased the $10.00 permit in previous years.[2] Lyles read these printed advertisements, and saw a television broadcast which featured Dailey's taxidermy services. He also received telephone calls from persons inquiring about the quality of Dailey's taxidermy work. In February of 1988, Agent Woodruff visited Dailey's residence and saw taxidermy equipment and materials, and apparently Dailey told Woodruff he was performing taxidermy work on fish.

Between April and June of 1988, Lyles and Woodruff also discovered evidence of other possible misdemeanor Code violations by Dailey. In particular, the two agents obtained written statements from Joe Lake, owner of Lake's Landing restaurant, and Herb Douthit to the effect that Dailey sold catfish to Lake. Lake indicated that he bought the catfish for personal use only, but noted that Dailey told him he had a commercial license. Dailey did not have such a license. Douthit's statement says that he bought catfish fillets from Lake which, he later found out, Lake had purchased from Dailey.

With this background information, Lyles and Woodruff, on or about June 1, 1988, began an "undercover" operation to gather additional evidence that Dailey was performing taxidermy work without a permit. They solicited the services of fellow agent Doug Yeager, who represented himself to Dailey as someone interested in having taxidermy work done on a largemouth bass. Eventually, Dailey agreed to mount Yeager's fish and accepted $35.00 from him as a down payment. Yeager delivered the fish to Dailey at the 311 Lakeland Drive address. Dailey informed Yeager that it would take six months to complete the taxidermy work.

---

1. The court takes these facts from the stipulated statement of factual and legal issue filed by the parties and, where appropriate, plaintiff's statement of facts and the testimony of the various deponents.

2. Exactly when Dailey last purchased a taxidermy permit is not clear from the record, though there is an indication that he had one in 1985 and some years before that.

The course of events which ensued is largely disputed by the parties, but the court is able to glean the following from the record made: Shortly after Dailey accepted the fish from Yeager, Lyles decided to wrap up the investigation. He spoke with David Pettijohn, an assistant Clay County prosecuting attorney with whose help Lyles had conducted the undercover investigation.[3] Pettijohn first recommended that Lyles and Woodruff wait until Dailey had the fish mounted before arresting him. Lyles, however, believed that Dailey was in violation of the Code when he received the fish and money from Agent Yeager, so waiting for Dailey to mount the fish was unnecessary. The other agents involved shared this belief.

On June 24, Lyles and Woodruff decided that they would "make contact with" Dailey concerning the taxidermy violation, either to ticket Dailey for that offense, and perhaps for selling catfish without a commercial license, or to arrest him.[4] In the early afternoon, Lyles arrived at the 311 Lakeland Drive address without an arrest warrant for any Code violations.[5] He knocked on the front door and, when Dailey opened the door a crack, said to Dailey, "We have a big problem Jeff" and "you're coming with me." Dailey opened the door about three feet and stood in his doorway, while Lyles stood on the porch in front of the door. During the conversation which ensued, Lyles indicated to Dailey that he was under arrest and grasped Dailey's arm, reaching across the threshold of the door to do so. Then, when Dailey's black labrador retriever approached Lyles, the agent pulled out his service revolver and pointed it at Dailey and the dog.

Dailey responded to Lyles' actions by shutting the door and retreating inside his home. He then telephoned his father, 911, his wife, without success, and Herb Douthit. Dailey remarked to Douthit that he wanted to kill Lyles.

While Dailey was back inside his residence, Woodruff arrived at the scene. He called for Dailey to come out of the house, and Dailey eventually did so. The agents then effected his arrest. Woodruff and a representative from the Clay County Sheriff's Department transported Dailey to the Clay County jail.

That same day, Woodruff applied for a search warrant for purposes of conducting a search of the 311 Lakeland Drive residence. The warrant, issued by the Honorable James Welsh, Circuit Court of Clay County, and executed by Lyles, Woodruff and several other law enforcement officers, resulted in the seizure of, among other things: a Northern Hawk (an endangered species); fourteen trout (the possession limit is ten under the Code); one crappie and one bass (which were not labelled in accordance with the Code); taxidermy supplies and materials; a sign stating "Dailey's Miracles of Nature Taxidermy"; a receipt book: and, a card file box with addresses of customers.

3. Lyles testified that he, Yeager and possibly Woodruff had a conversation with Pettijohn in early June concerning the investigation because they wanted to avoid entrapping Dailey when Yeager called to have his fish mounted. They also discussed the best way to proceed with an investigation into whether Dailey was selling catfish illegally. Plaintiff does not deny this conversation took place.

4. Lyles has testified that he and Woodruff agreed to make contact with Dailey on June 24 and expected to write him a ticket for the taxidermy offense and possibly the catfish offense. Dailey, on the other hand, alleges that Lyles went to Dailey's house with the intention of arresting him.

5. Lyles testified that he learned on June 24 of an outstanding arrest warrant for Dailey's arrest issued by Kansas City, Missouri as a result of traffic violations. Dailey contends that Lyles has never established the existence of such a warrant on June 24, 1988.

The court will assume that Dailey's arrest was not made pursuant to an outstanding warrant. Missouri Supreme Court Rule 37.46, which Lyles cites for the proposition that he did not need to have the warrant in his possession at the time he arrested Dailey, applies, by implication, when an arrest is based on the outstanding warrant and the arrestee is so notified. In the instant case, there is no evidence that Lyles relied on the warrant when he arrested Dailey or informed Dailey of its existence. To the contrary, the record indicates that Lyles arrested Dailey because he believed Dailey was engaging in taxidermy without a permit.

As a result of the events of June 24, 1988, Dailey was charged with the following misdemeanors: resisting the arrest of Agent Lyles; resisting the arrest of Agent Woodruff; engaging in taxidermy without a permit; unlawful possession of an endangered species; possession of trout over the legal limit; possession of one unlabeled bass and one unlabelled crappie; possession of catfish over the dailey limit; sale of unlabelled catfish; and, giving away unlabelled wildlife.

Dailey was convicted by a jury of just one of these charges—resisting the arrest of Agent Lyles. The jury acquitted him of resisting the arrest of Agent Woodruff, while the trial court judge sustained motions for acquittal on the charges of performing taxidermy without a permit and possession of an endangered species. The taxidermy charge was dropped because the state failed to provide the court with a jury instruction establishing the penalty for violations of the Code. The remaining five charges were dismissed by the prosecutor.

## II. *Analysis*

In reviewing defendant's motion for summary judgment against Dailey, the court must consider whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has explained that there is no genuine issue for trial unless sufficient evidence exists for a jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "If [such] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2510–11 (citations omitted). Any inferences to be drawn from the facts, however, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Once the moving party has carried its burden under Rule 56(c), the nonmoving party must do more than "rest upon the mere allegations or denials" in its pleadings, Fed.R.Civ.P. 56(e), or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Rather, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed.R.Civ.P. 56(e)).

Finally, the court notes that summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

### A. The False Arrest and Malicious Prosecution Claims

As noted, plaintiff brings Count I of this action pursuant to § 1983. Section 1983 provides a remedy for deprivation of rights protected by the Constitution or federal statute by a person acting under color of state law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970); *Mayhugh v. Bill Allen Chevrolet*, 371 F.Supp. 1, 3 (W.D.Mo. 1973), *aff'd, Nowlin v. Professional Auto Sales, Inc.*, 496 F.2d 16 (8th Cir.), *cert. denied*, 419 U.S. 1006, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). In order to recover under § 1983, plaintiff must demonstrate an entitlement, right, or liberty interest that is protected by federal or state law. *Wilson v. Walden*, 586 F.Supp. 1235, 1236 (W.D.Mo.1984) (citations omitted).

The court concedes, for purposes of Dailey's two § 1983 claims, that Lyles was acting under color of state law and that Dailey claims federally protected rights were violated. Dailey alleges in Count I that Lyles arrested him "without probable cause, a warrant or any legal basis for his action." Pl.'s Compl. at 11. Count I concerns only whether Lyles had the authority

and enough information to make a lawful warrantless arrest of Dailey, not whether the arrest was lawful as carried out. For purposes of this order, the court will assume, although the issue is contested by defendant, that Lyles did in fact arrest Dailey when he confronted Dailey at his residence on June 24, 1988.

■ Dailey's fundamental argument in support of Count I is that Lyles did not have probable cause to arrest him, or that at least there is a material question of fact concerning whether he did. The court, however, has no difficulty in determining that Lyles had, as a matter of law, probable cause to believe that Dailey had violated or was violating the misdemeanor offense of practicing taxidermy without a permit, and thus had probable cause to arrest Dailey.

Probable cause exists when the facts and circumstances known to the government agent involved are sufficient to warrant a prudent person in believing that the suspect has committed or is committing an offense. *United States v. Calkins*, 906 F.2d 1240, 1244 (8th Cir.1990) (citations omitted). The facts of this case show that Lyles knew Dailey was advertising his taxidermy service, had agreed to mount a fish for Agent Yeager for $70.00, had accepted the fish and $35.00 from Yeager as a down payment, and did not have a permit to perform taxidermy work. Lyles also knew that Woodruff had seen taxidermy equipment in Dailey's basement a few months earlier. This information alone is enough to support probable cause for Dailey's arrest. Certainly the Judge who on June 24 issued Woodruff a search warrant for Dailey's residence believed there was probable cause of wrongdoing.[6]

■ Dailey makes two other arguments which, he contends, support his claim in Count I regardless of the existence of probable cause. The first involves an interpretation of Missouri law. Dailey's position is that it was "patently unreasonable" for Lyles to carry out a warrantless misdemeanor arrest because Lyles does not have the authority to make such an arrest outside lands owned, operated, managed, or leased by the Missouri Conservation Commission. Furthermore, Dailey argues that Missouri law specifically prohibits conservation agents from making a warrantless arrest for a misdemeanor which occurs outside the presence of the agent. As support, Dailey cites Mo.Stat.Ann. § 252.085, which states in relevant part that certain qualified conservation agents:

> are hereby declared to be officers of the state of Missouri and ... [a]ll such agents shall have authority to arrest, without warrant or process of any kind, any person who they have probable cause to believe has committed or is in the process of committing any violation of the laws of the state of Missouri, on all lands owned, operated, managed, or leased by the commission ... provided ... that no arrest may be made without a warrant for the commission of a misdemeanor committed outside the presence of the agent.

Section 252.085 (Vernon 1990).

The court, having examined Missouri law pertaining to the Department of Conservation, is convinced that § 252.085 is inapplicable to the instant case and that Lyles' actions are instead properly viewed under Mo.Stat.Ann. § 252.080 (Vernon 1945). This statute reads:

> **Arrest by commission agents for violations of conservation rules, powers**
>
> Every authorized agent of the commission shall have the same power to serve criminal process as sheriffs and marshals, only in such cases as are violations of this law and rules and regulations of the commission, and have the same right as sheriffs and marshals to require aid in the execution of such process. *Any such*

---

6. Dailey, in arguing that there was a lack of probable cause, makes much of the fact that Assistant Prosecutor Pettijohn suggested that Lyles should wait until the fish was mounted before arresting Dailey. The court is confused as to exactly what plaintiff thinks this proves, because there is certainly no indication in the record that Pettijohn made this suggestion because he believed Lyles did not have probable cause. More likely, he did so because the mounted fish might have proved beneficial to the prosecutor's office during trial.

*agent may arrest, without warrant, any person caught by him or in his view violating or who he has good reason to believe is violating, or has violated this law or any such rules and regulations,* and take such person forthwith before an associate circuit judge or any court having jurisdiction, who shall proceed without delay to hear, try and determine the matter as in other criminal cases.

Section 252.080 (emphasis added). The statute deals specifically with violations of the rules and regulations of the Missouri Conservation Commission, including Code violations such as practicing taxidermy without a permit.[7] It does not restrict agents to making such arrests on Conservation Department property, nor does it specify that the violations must occur on Department property, and there is no language in the statute requiring the violation to occur in the presence of the arresting agent. Moreover, it cannot be argued that such restrictions should be read into the statute since at least some of the acts prohibited by the Code, such as engaging in taxidermy without a permit, are not likely to occur on Department property or in the presence of a Department agent.

In contrast, the language of § 252.085 clearly governs arrests by Department agents for violations of Missouri law other than Code violations, such as the Criminal Code. The statute grants qualified conservation agents authority to arrest persons for actions the agents know to be illegal, but would not ordinarily fall within their police powers since they are not Code violations. For example, if the sale of illegal

narcotics was taking place on Department land, a qualified Conservation agent would be able to arrest the perpetrators without waiting for a warrant or a police officer. If the crime is a felony, the agent does not need to be present when the unlawful activity takes place in order to make a warrantless arrest, as long as probable cause exists. If the violation simply amounts to a misdemeanor, however, it must be committed in the presence of the agent before a warrantless arrest is permitted.[8]

Since § 252.080, not § 252.085, governs in the instant case, Lyles had the authority to make a warrantless arrest of Dailey because he had probable cause to believe Dailey was committing the Code offense of practicing taxidermy without a permit. Consequently, it was not patently unreasonable for Lyles to arrest Dailey.

■ Dailey's final argument in support of Count I is that his arrest was "illegal and unreasonable per se" since the offense for which he was arrested is not a criminal offense. Dailey reaches this conclusion by first citing Missouri law for the proposition that "[n]o conduct constitutes an offense unless made so by [Missouri Criminal] [C]ode or by other applicable statute." Mo. Stat.Ann. § 556.026 (Vernon 1979) (bracketed material comes from § 556.011). Dailey then notes that the attorney who prosecuted him for Wildlife Code violations was unable to submit a penalty instruction for the offense of engaging in taxidermy without a permit, which he says proves that there is no penalty provision for the offense for which he was arrested.[9] Con-

---

7. As noted later in this order, Dailey denies that practicing taxidermy without a permit can be considered a criminal offense under Missouri law since the Code provides no penalty for such a violation. He does not dispute, however, that the Code does prohibit the practice of taxidermy without a permit, nor does he dispute that the prohibition is a rule or regulation of the Conservation commission.

8. The statute comports with the general rule, recognized in *Rustici v. Weidemeyer,* 673 S.W.2d 762, 769–70 (Mo.1984), that peace officers may arrest without a warrant any person who commits a misdemeanor in their presence, which implies that officers should not attempt war-

rantless arrests for misdemeanors not committed in their presence. This general rule does not prevent peace officers from being granted additional arrest authority by a statute such as § 252.080. *Cf. id.* at 770 (court cites two Missouri statutes granting peace officers authority to arrest persons who they have reasonable cause to believe violated any applicable ordinance whether or not the act has taken place in the officer's presence).

9. Actually, Dailey claims that defendant has conceded that no penalty provision exists under Missouri law for engaging in taxidermy without a permit. This is inaccurate. Far from conceding the point, Lyles argues that there is a

duct, Dailey asserts, cannot be considered criminal unless its prohibition is accompanied by a penalty provision, therefore he did not commit a criminal offense. If he did not commit a criminal offense, Dailey's argument goes, then he did nothing for which he could be arrested. He concludes by stating that since he did nothing for which he could be arrested, Lyles had no power to arrest him, thereby rendering his arrest by Lyles unreasonable regardless of probable cause.

This argument rests upon unsupported and unconvincing assertions. Assuming, *arguendo*, that Lyles could be held liable for enforcing Wildlife Code rules not accompanied by penalty provisions, this is not the proper case to do so. For here, there is a penalty provision for practicing taxidermy without a permit. Section 557.021(1) of Missouri Statutes Annotated says that "[a]ny offense defined outside this code which is declared to be a misdemeanor without specification of the penalty therefor is a class A misdemeanor." (Vernon 1988). The misdemeanor offense of practicing taxidermy without a permit is defined in the Wildlife Code, which is outside the Criminal Code, and is unaccompanied by a penalty provision. It is therefore a class A misdemeanor under Missouri law. Such misdemeanors are punishable by imprisonment for a term not to exceed one year. Mo.Stat.Ann. § 558.011(1)(5) (Vernon 1988). As a result, Dailey's arrest for the taxidermy offense was not "unreasonable per se."

The court finds that as a matter of law Lyles had probable cause to arrest Dailey for practicing taxidermy without a permit and that such arrest was not otherwise unlawful. Therefore, summary judgment is appropriate as to Count I of Dailey's complaint. There was also probable cause

to prosecute Dailey for the offense, rendering summary judgment appropriate on Dailey's malicious prosecution claim also. *See Burnett v. Griffith*, 769 S.W.2d 780, 784 n. 2 (Mo.1989) (citations omitted) (Among the six elements a party suing on a theory of malicious prosecution must plead and prove is that there is a want of probable cause for the prosecution).

**B. The Forcible Entry Claim**

■ Plaintiff brings a second count under § 1983, contending that Lyles "forcibly entered plaintiff's residence and forcibly removed plaintiff from inside of and around his residence without warrant or any legal basis therefore...." Pl.'s Compl. at 12. The basis of this claim is that Lyles reached across the threshold of Dailey's residence to effect a warrantless arrest despite the absence of exigent circumstances. For Dailey, the salient facts begin when:

> Lyles knocked on his door on June 24, 1988, [Dailey] partially opened his door and Lyles then told him that "we've got a problem" and that "you're under arrest and I'm taking you to Liberty." While Dailey stood inside the front of his doorway, Lyles reached across the threshold and grabbed Dailey by his shoulder in an attempt to literally pull Dailey outside. Even Lyles has admitted that, at this point, Dailey struggled from his grasp and told Lyles "you can't come in my house."

Pl.'s Suggestions in Opp'n to Summ. J. at 12. These facts alone, Dailey suggests, raise a genuine issue of material fact concerning whether Lyles entered Dailey's residence to make a warrantless arrest.[10]

■ The court believes that Dailey's Fourth Amendment rights were not violated when Lyles reached across the threshold

penalty provision for this offense, though he agrees that the government failed to submit a proper jury instruction during Dailey's criminal trial.

10. Dailey also testified that Lyles and Woodruff grabbed him by the shoulders when he returned to his front door and took him out to the street. However, he does not make much of the argument that this violated his constitutional rights,

and with good reason. At the very least, the facts clearly indicate that Dailey came to the door voluntarily this second time anticipating his arrest. These facts do not support a § 1983 action for improper warrantless arrest. *See Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir.), *cert. denied*, 493 U.S. 852, 110 S.Ct. 152, 107 L.Ed.2d 110 (1989).

and grabbed him since, as the following discussion shows, Dailey relinquished, at least in part, his expectation of privacy when he was arrested by Lyles. The court, however, does not need to reach that conclusion for summary judgment to be appropriate in this case. Lyles, a state Conservation agent, is shielded from liability in this case by qualified immunity so long as he did not violate one of Dailey's clearly established constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982); *Wilson v. Walden,* 586 F.Supp. 1235, 1238 (W.D.Mo.1984). Since the facts show that Lyles did not violate a clearly established constitutional right when he arrested Dailey, Lyles' motion for summary judgment must be granted.

The rule of law concerning immunity for state agents is that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The determinations of when to confront Dailey, where to confront him, and whether to write him a ticket or carry out an arrest were clearly within Lyles' discretion, thus making him eligible for qualified immunity. *See Green v. Denison,* 738 S.W.2d 861, 865 (Mo.1987) (en banc) (court concludes that police officers making an arrest were carrying out discretionary function and were entitled to official immunity); *Schutte v. Sitton,* 729 S.W.2d 208, 211 (Mo.App.1987) (court finds that officer who chose not to make an arrest was exercising discretion, and court limits a contrary determination in *Rustici,*

673 S.W.2d at 765, 771, to its facts and its holding that an officer does not exercise discretion in determining whether he has a warrant in his possession prior to making an arrest).

The bright-line rule in the area of arrests is that, absent exigent circumstances or consent, the Fourth Amendment prohibits officers from crossing the threshold of an individual's residence to effect an arrest of that individual without a warrant. *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980).[11] When a warrantless arrest takes place in an individual's doorway, the bright line fades since obviously an individual's expectation of privacy is reduced when he or she opens the door to the outside world. Several courts have held that the doorway is a public place, obviating the need for an arrest warrant. *See United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976) (Court concludes that a woman standing in her doorway was in a public place); *State v. Mansfield,* 748 S.W.2d 949, 952 (Mo.App.1988) (court holds that a man standing on his porch or in the threshold of his door is in a public place for arrest purposes). Other courts have noted that there is confusion as to whether the doorway is a public place. *United States v. Davis,* 785 F.2d 610, 615 (8th Cir.1986) (court notes a split among the circuits as to whether a warrantless arrest in a persons' doorway constitutes an arrest in a public place or an improper house arrest).

Businesses are public places for arrest purposes, and in this case there is the added twist that Dailey used his residence as a business center.[12] Dailey admits that

---

**11.** Lyles urges that exigent circumstances existed since any delay in arresting Dailey may have allowed him the opportunity to destroy evidence, citing *United States v. Padilla,* 869 F.2d 372, 379 (8th Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3223, 106 L.Ed.2d 572 (1989). While this is a factor in determining whether exigent circumstances exist, the court believes that other factors such as the minor offense for which Dailey was arrested and the lack of any reasonable belief that Dailey was armed and dangerous, or that he would escape if not quickly apprehended, necessitate a finding that no exigent circumstances existed for Dailey's arrest.

*See Duncan v. Storie,* 869 F.2d at 1102 n. 3 (citations omitted) (court recites factors for determining the existence of exigent circumstances).

**12.** Plaintiff, in his response to defendant's motion for summary judgment, refers to his home business activity as a "'hobby' business," as though there might be some difference between that and a regular business. The court is not convinced that there is any distinction between the two, especially in this case where plaintiff originally claimed that damage to his "hobby" was worth $700,000 in compensatory damages.

his taxidermy equipment is located in his basement, and the boat and truck he uses in his guide business are kept there. He at least implies that persons interested in his services might come to his door.[13] From Agent Yeager's deposition testimony, it appears that he went to the 311 Lakeland address to drop off the fish he wanted Dailey to mount. Dailey did not have any other business address, and he took a tax break for running a business out of his home. These facts may not render his whole residence a "public place" for arrest purposes, but they do suggest that Dailey has a lesser expectation of privacy in his doorway, and perhaps other areas of his residence, than do persons who use their homes solely as residences.

It is evident from the foregoing that there is no clear rule of law concerning the constitutionality of warrantless doorway arrests, especially when the doorway in question leads to both a business headquarters and a residence. Consequently, when Lyles reached across the threshold and grasped Dailey's arm he did not violate any clear established constitutional right.

The opinion in *Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir.), *cert. denied*, 493 U.S. 852, 110 S.Ct. 152, 107 L.Ed.2d 110 (1989), does not compel a contrary result. In *Duncan*, decided the year after Dailey arrested Lyles,[14] the Eighth Circuit decided that the important issues when testing the validity of a warrantless doorway arrest are "the individual's reasonable expectation of privacy and whether that individual came to the doorway voluntarily." There, plaintiff alleged that he was trying to shut the door on two police officers who did not announce their intention to arrest plaintiff until after they had prevented him from closing the door and dragged him out of his home. If true, the court held, it could not determine as a matter of law that plaintiff had put himself in a public place voluntar-

ily and willingly relinquished his expectation of privacy.

In the instant case, Dailey knew immediately of Lyles' intention to arrest him. He was not dragged out of his residence by Lyles. Dailey came to the door in response to Lyles' knock which, if not wholly voluntary, is at least not involuntary as the result of deception or force. *See United States v. Morgan*, 743 F.2d 1158, 1166 (6th Cir.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir.1980), *aff'd on other grounds*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). When Dailey realized who was at the door he did not immediately attempt to shut the door on Lyles, nor was he prevented from closing the door. Dailey's reduced expectation of privacy has already been touched upon—he was standing in the doorway of the address he used as both his residence and his business. Expanding on those facts, the court notes that Dailey had the door open three feet wide during his conversation with Lyles, who was standing on Dailey's porch. The porch is exposed to "public" view. Dailey did not attempt to retreat into his home until he shut the door on Lyles, though after shaking free of Lyles' grasp he did tell the agent that he could not enter the house. Dailey waited until his dog approached and Lyles drew his gun to shut the door and retreat into his home. Once Dailey retreated into his home, Lyles did not attempt to violate his expectation of privacy by entering the residence or otherwise. Dailey, unlike the plaintiff in *Duncan*, is unable to assert facts which, if true, violate a clearly established constitutional right.

The court's purpose in determining whether Lyles is entitled to qualified immunity is not to determine whether Lyles chose the best way to carry out the arrest, but only to decide whether the method

---

**13.** The court draws this implication from the following colloquy, which took place during the deposition of Dailey:

Q Somebody wants to do business with you … they come to Lakeland Drive, right?
A Not necessarily so.
Q Okay do you have another place?
A It could be a phone call.

**14.** Thus, to the extent the case instituted a new test for determining the propriety of a doorway arrest or clarified what before was unclear, Lyles cannot be required to have anticipated this holding.

Lyles did use to effect the arrest violated a clearly established constitutional right. The court believes it did not. Accordingly, it is

ORDERED that defendant's motion for summary judgment is granted; further, it is

ORDERED that this decision of the court constitutes a final judgment and the court's order of December 2, 1991 is vacated in favor of this one.