# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1931

_____

Charles Marc Mitchell

*Plaintiff - Appellee*

v.

Josh Shearrer

*Defendant - Appellant*

Eric Spiker; Clifton Bone; Matt Richardet

*Defendant*s

_____

No. 12-2058

_____

Charles Marc Mitchell

*Plaintiff - Appellant*

v.

Josh Shearrer

*Defendant*

Eric Spiker; Clifton Bone

*Defendants - Appellees*

Matt Richardet

*Defendant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 15, 2013
Filed: September 10, 2013

_____

Before RILEY, Chief Judge, WOLLMAN and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Farmington, Missouri, Police Officer Joshua Shearrer arrested Charles Mitchell in the doorway of his home, with the assistance of Officers Erik Spiker and Clifton Bone. Mitchell filed this action under 42 U.S.C. § 1983, alleging that the officers violated his constitutional rights by arresting him in his home without first obtaining a warrant to do so. The district court[1] granted the defendants' motion for summary judgment based upon qualified immunity as to Spiker and Bone, but denied qualified immunity as to Shearrer.[2] We affirm the denial of qualified immunity as to Shearrer, and we dismiss for lack of jurisdiction Mitchell's challenge to the grant of qualified immunity as to Spiker and Bone.

_____

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

[2]Jailer Matt Richardet did not appeal from the denial of qualified immunity on certain claims relating to the length of Mitchell's detention.

## I.

During the evening of October 21, 2009, Mitchell allowed grass clippings and leaves from his lawn to be cast upon the street in front of his house, in violation of Farmington Municipal Code § 210.750. After the police department received a complaint about the clippings and leaves, Officer Shearrer went to Mitchell's residence to investigate. To arrive at Mitchell's front door, Shearrer climbed two steps and stood on the front porch. A glass storm door opens onto the front porch, with the door handle on the right, and a wooden door opens into the house, with the door handle also on the right. There is no peep hole on the inside door.

Just before 8:00 p.m., Shearrer either knocked on the door or rang the doorbell at Mitchell's residence. Mitchell turned on his porch light and opened the wooden door, not knowing who was there. After Mitchell opened the door, he saw Shearrer in uniform, holding a flashlight. Shearrer held open the storm door and identified himself as a Farmington police officer.

According to Mitchell, Shearrer asked him to come outside so that Shearrer could show him the clippings and leaves in the street. Mitchell replied, "I'm not coming out. I'm going to bed." Shearrer informed him that he had received a complaint about the clippings, whereupon Mitchell admitted that he had mowed his lawn and that he had "been doing it this way for fifteen years." As Mitchell began to close the wooden door, Shearrer stuck his foot into the doorway, preventing the door from closing. Shearrer repeated his request that Mitchell come outside, to which Mitchell responded, "I'm not coming out there. I'm going to bed." With his foot in the doorway, Shearrer asked for identification, to which Mitchell responded, "If you are not arresting me, I am going to bed."

Soon thereafter, Officers Spiker and Bone arrived in separate squad cars. Mitchell testified that all three officers "tried to remove me from my door." The

-3-

officers pulled Mitchell's left arm, and he braced himself. At his deposition, Mitchell explained:

> Q.   At this point is it fair to say you're standing in your doorway?
> A.   I'm still inside the house.
> Q.   Is any part of you inside the actual doorframe itself?
> A.   Everything but my left arm is still inside the house.

As the officers tugged Mitchell's arm a second time, he grabbed the woodwork on the inside of the door with his right hand. The door pressed against his chest, leaving a mark. After Mitchell stopped resisting, he was pulled onto the porch, forced to the ground, and handcuffed. According to Mitchell, the officers then told him that he was under arrest.

Shearrer had a similar recollection of the encounter. Shearrer believed that Mitchell "display[ed] a hostile attitude" and "posed [a] higher than usual threat due to what [Shearrer had] perceived as his aggressive and hostile tone and manner." Shearrer testified that he had repeatedly asked Mitchell to step onto the porch, but Mitchell refused to do so. When Mitchell began closing the door, Shearrer "placed [his] foot in the threshold of the doorway, preventing the door from fully closing." Shearrer explained that when Mitchell thereafter refused Shearrer's request to step outside, Shearrer informed Mitchell that he was under arrest and then reached for Mitchell's arm or wrist as Mitchell tried to shut the door. Shearrer described the struggle as "a tugging and tussling match in which [Shearrer] was trying, unsuccessfully, to get Mr. Mitchell out of the doorway and to get his hands behind his back to handcuff him." Officers Spiker and Bone arrived during the scuffle and assisted Shearrer in subduing and handcuffing Mitchell. Shearrer ultimately issued citations to Mitchell for dispersing debris into a public street or sewer, refusing the lawful command of a police officer, and resisting arrest.

Shearrer appeals from the denial of his motion for qualified immunity. Mitchell cross appeals from the grant of qualified immunity to Spiker and Bone.

II.

We first address the scope of our jurisdiction. Title 28, United States Code, section 1291 provides that federal courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts[.]" Under the collateral order doctrine, "[w]e have jurisdiction to consider an interlocutory appeal of an order denying qualified immunity to the extent the appeal seeks review of 'purely legal determinations made by the district court.'" Sherbrooke v. City of Pelican Rapids, 513 F.3d 809, 813 (8th Cir. 2008) (quoting Wilson v. Lawrence Cnty., Mo., 260 F.3d 946, 951 (8th Cir. 2001)). Accordingly, we have jurisdiction to consider whether the facts, taken in the light most favorable to Mitchell, support a finding that Shearrer violated Mitchell's clearly established constitutional rights.

We do not have jurisdiction, however, to consider Mitchell's appeal from the grant of summary judgment in favor of Spiker and Bone. The district court has not issued a final decision, and "[t]he collateral order doctrine does not apply . . . when a party complains that the district court should not have granted summary judgment based on qualified immunity." Coleman v. Parkman, 349 F.3d 534, 537 (8th Cir. 2003) (emphasis omitted). Mitchell contends that his cross appeal falls within our pendent appellate jurisdiction because resolution of Shearrer's appeal necessarily will resolve the cross appeal. We disagree. To decide the appeal, we must determine whether there exists a genuine issue of material fact that Shearrer violated Mitchell's clearly established constitutional rights when he reached across the threshold and placed Mitchell under arrest. The cross appeal, however, presents a different question because Spiker and Bone merely assisted Shearrer in subduing Mitchell. There is no evidence to suggest that Spiker and Bone were involved in the decision to arrest Mitchell or that they knew or should have known that the seizure was unlawful.

-5-

Accordingly, the grant of summary judgment to Spiker and Bone is not inextricably intertwined with the denial of summary judgment as to Shearrer. See Langford v. Norris, 614 F.3d 445, 458 (8th Cir. 2010) (explaining that "[a] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal") (alteration in original) (quoting Kincade v. City of Blue Springs, Mo., 64 F.3d 389, 394 (8th Cir. 1995)). We thus dismiss the cross appeal for lack of jurisdiction.

III.

Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. Hope v. Pelzer, 536 U.S. 730, 739 (2002); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). We review *de novo* a district court's decision to grant or deny summary judgment on the basis of qualified immunity. Santiago v. Blair, 707 F.3d 984, 989 (8th Cir. 2013). We view the facts in the light most favorable to the plaintiff, accepting as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed. Id.

Qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001); see also Pearson v. Callahan, 555 U.S. 223, 236 (2009) (holding that courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first).

A.

Our initial inquiry is whether the facts alleged support Mitchell's contention that Shearrer violated his Fourth Amendment right to be free from unreasonable seizures when Shearrer arrested him in the doorway of his home. The Supreme Court has said, "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). The warrantless arrest of an individual in a public place upon probable cause, however, does not violate the Fourth Amendment. United States v. Watson, 423 U.S. 411, 423-24 (1976). It is undisputed that although Shearrer did not have an arrest warrant, probable cause existed to arrest Mitchell. Accordingly, viewing the facts in the light most favorable to Mitchell, we must determine whether Mitchell was arrested in his home or in a public place.

In United States v. Santana, the Supreme Court held that the defendant was located in a public place when the police first sought to arrest her and thus was not entitled to Fourth Amendment protection. 427 U.S. 38, 43 (1976). Santana was standing at the threshold of her home when law enforcement officers arrived, following a controlled buy of heroin. Id. at 40. Santana stood "directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." Id. at n.1. When the officers exited their vehicle and shouted "police," Santana retreated into her home, with the officers in pursuit. Id. at 40. Santana was apprehended shortly thereafter in the vestibule of her home. Id. In concluding that the threshold constituted a public place, the Court wrote, "[Santana] was not in an area where she had any expectation of privacy. . . . She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." Id. at 42.

We considered Santana in Duncan v. Storie and concluded that it would be "unwise to become preoccupied with the exact location of the individual in relation to the doorway." 869 F.2d 1100, 1102 (8th Cir. 1989). Instead, "the crucial issues involve the individual's reasonable expectation of privacy and whether that individual came to the doorway voluntarily." Id. According to the plaintiff in Duncan, he had opened his front door to meet two law enforcement officers as they approached his home. Id. at 1101. When Duncan ascertained that the officers had come to arrest him, he stepped farther back into his home and attempted to close the door, but the officers "prevented him from doing so and pulled him out of his home." Id. We held that under the Duncan's version of the facts, "it would be impossible to hold as a matter of law that [Duncan] voluntarily placed himself in a public place and willingly relinquished the expectation of privacy that he is entitled to when he is within his home." Id. at 1103.

Shearrer contends that Duncan is distinguishable because Mitchell "opened the door and stood in the doorway wholly voluntarily[,]" Appellant's Br. 19, whereas the law enforcement officers in Duncan had "duped that plaintiff into opening the door[,]" Reply Br. 9. We see no meaningful distinction between the facts of how the two plaintiffs came to stand in their doorways. Mitchell opened his home's interior door in response to a knock, without knowing who was standing on his porch. Duncan saw the officers approaching his home and opened the door. As far as we can tell, Duncan opened the door under the mistaken impression that the officers had come to retrieve a report.[3] Both Mitchell and Duncan thus initially came to stand in their doorways

---

[3]Shearrer misstated the facts of Duncan when he argued that Duncan "at first thought the officers were there to deliver a report to him which a feuding fellow law-enforcement officer had indicated he would have delivered (thus creating an inference that he'd been duped into opening his door)." Appellant's Br. 19. According to the facts recounted in the opinion, Duncan tried to hand the officers a report he had written, 869 F.2d at 1101 & n.2, 1103, and there is no indication that Duncan and the arresting officer previously had discussed meeting at Duncan's home, id. at 1101.

voluntarily, without coercion or deceit by the law enforcement officers. See Duncan, 869 F.2d at 1102 (citing cases that hold that when an officer compels or deceives an individual to open the doorway to his home, the individual does not voluntarily expose himself to a warrantless arrest). When they attempted to close their doors, however, Mitchell and Duncan were physically stopped from doing so and were thereafter pulled out of their homes and placed under arrest.

Shearrer argues that we must determine whether Mitchell stood in a public place when probable cause arose, but Santana teaches that the relevant inquiry is whether the arrestee was in a public place "when the police first sought to arrest [the individual.]" 427 U.S. at 42. Viewing the facts in the light most favorable to Mitchell, Shearrer first sought to arrest Mitchell after he tried to close the interior door. As in Duncan, a jury could find that Mitchell was within his home—standing far enough away from the threshold to allow the interior door to swing mostly shut and maintaining a reasonable expectation of privacy—when Shearrer began to effectuate the arrest. Duncan, 869 F.2d at 1103 ("A jury could find that Duncan's attempt to retreat, much like the suspect's retreat in Santana, placed him firmly inside his home and the officers would be required to demonstrate exigent circumstances." (footnote omitted)). Unlike Santana, who "was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house[,]" Mitchell testified that he was standing inside his home, where the Constitution affords him the greatest measure of privacy. See Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting Silverman v. United States, 365 U.S. 505, 511 (1961))). Mitchell has thus set forth sufficient facts to show a violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

B.

Our second inquiry in considering the denial of qualified immunity is whether the right violated was clearly established. Whether the facts alleged support such a claim is a legal question for the court to decide. Kahle v. Leonard, 477 F.3d 544, 549 (8th Cir. 2007). A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The relevant, dispositive inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

The Fourth Amendment requires that all searches and seizures be reasonable. It has long been established that warrantless searches and seizures inside a home are presumptively unreasonable. Guite, 147 F.3d at 750 ("It is clearly established that the Fourth Amendment prohibits a warrantless entry into a suspect's home to make a routine felony arrest absent consent or exigent circumstances."); see also Welsh v. Wisconsin, 466 U.S. 740, 750 (1984) ("Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries."). Duncan made clear that in the absence of exigent circumstances, an officer cannot reach over the threshold and into a person's home to forcibly effectuate a warrantless arrest. 869 F.2d at 1103 ("Duncan's version of the arrest asserts violations of clearly established constitutional rights[.]"). Accordingly, a reasonable officer would have known that at the time Mitchell tried to close the door, he stood within his home and thus could not be pulled therefrom and placed under arrest in the absence of exigent circumstances.

Shearrer argues that the law was clearly established that "[a] doorway opened in response to a mere knock . . . is a public place for purposes of the [Fourth]

-10-

Amendment." Reply Br. 7. As set forth above, we consider whether the door was opened voluntarily, but <u>Santana</u> established that the constitutional inquiry begins with whether the arrestee was located in a public place "when the police first sought to arrest [the individual.]" 427 U.S. at 42; <u>see also</u> <u>Duncan</u>, 869 F.2d at 1102 (rejecting the officers' argument "that under the <u>Santana</u> decision an officer might reasonably believe that Duncan's appearance at the door constituted entrance into a public place").

We also find unpersuasive Shearrer's argument that <u>Dailey v. Lyles</u> held "that <u>Duncan</u> does not clearly establish the law as Mr. Mitchell asserts it[.]" Reply Br. 8 (citing <u>Dailey v. Lyles</u>, 785 F. Supp. 812 (W.D. Mo. 1992), <u>aff'd without opinion</u>, 993 F.2d 175 (8th Cir. 1993)). The district court in <u>Dailey</u> distinguished the facts of its case with those of <u>Duncan</u>, noting that unlike Duncan, "Dailey knew immediately of [the officer's] intention to arrest him. He was not dragged out of his residence by [the officer]. . . . When Dailey realized who was at the door he did not immediately attempt to shut the door on [the officer], nor was he prevented from closing the door." <u>Dailey</u>, 785 F. Supp. at 821. The district court also found that Dailey had a reduced expectation of privacy because "he was standing in the doorway of the address he used as both his residence and his business" and that, at the time of the arrest, Dailey "had the door open three feet wide." <u>Id.</u> Unlike the arrest in <u>Dailey</u>, the facts pertaining to Shearrer's seizure of Mitchell are not materially distinguishable from the officers' seizure of Duncan, as we have set forth in detail above. Moreover, <u>Duncan</u> was decided after Dailey had been arrested and thus the district court concluded that the officer in its case "cannot be required to have anticipated [<u>Duncan</u>'s] holding." <u>Dailey</u>, 785 F. Supp at 821 n.14.

-11-

IV.

We affirm the district court's order denying qualified immunity as to Shearrer[4] and dismiss for lack of jurisdiction Mitchell's cross appeal challenging the grant of qualified immunity as to Spiker and Bone.

_____

[4]Shearrer argues that Mitchell is not entitled to anything more than nominal damages, if he succeeds on his claim for unlawful arrest. We do not address this argument on interlocutory appeal. See Langford, 614 F.3d at 457-58. Nor do we consider Shearrer's argument first raised in his reply brief that he is entitled to qualified immunity because the seizure was a *de minimis* intrusion on Mitchell's constitutional rights. See Fed. R. App. P. 28(a)(9).