# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3693

_____

Victor Santiago

*Plaintiff - Appellee*

v.

Daniel Blair, Lieutenant, Potosi Correctional Center, Individually and Officially; Timothy Williford, Correctional Officer I, Potosi Correctional Center, Individually and Officially; Andrew Fox, Correctional Officer I, Potosi Correctional Officer, Individually and Officially; Garry Branch, Captain, Potosi Correctional Center, Individually and Officially; Shannon Clubbs, Correctional Officer, Potosi Correctional Center, Individually and Officially; David E. Parsons, Correctional Officer, Potosi Correctional Center, Individually and Officially

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 19, 2012
Filed: September 27, 2013

_____

Before WOLLMAN, BEAM, and LOKEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Captain Garry Branch, Lieutenant Daniel Blair, and Correctional Officers Timothy Williford, Andrew Fox, Shannon Clubbs, and David E. Parsons (collectively Correctional Officers) appeal the district court's denial of their motion for summary judgment based upon qualified immunity. We affirm in part, reverse in part, and remand for further proceedings.

## I. Background

The facts in this case are heavily disputed. Because this is an appeal from the denial of the Correctional Officers' motion for summary judgment, the facts are taken in the light most favorable to plaintiff, Victor Santiago. Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009). In 2008, Santiago was an inmate at the Potosi Correctional Center, in Mineral Point, Missouri. On July 26, 2008, Santiago was scheduled to work kitchen duty but did not report for work, prompting Lieutenant Blair to initiate a search for him. Santiago was discovered in the recreational area and sent to the kitchen to report for duty. When Santiago arrived at the kitchen, Blair told him that he was being sent to administrative segregation for his failure to report to work and ordered him to "strip out." While he was stripping out, Santiago began arguing with Blair. Eventually, Blair approached Santiago with his handcuffs out and told Santiago that he was going to "kick his ass." Santiago assumed a defensive position and told Blair that if he touched him, Santiago was going to "drop him."

Blair ordered another correctional officer who was present to make a "10-5 call," which indicates that an officer needs assistance. As staff began to respond to the call, Blair persuaded Santiago to submit to being handcuffed. While he was placing the handcuffs on Santiago, Blair said "let me lock the safety, we wouldn't want [the handcuffs] to accidentally tighten on you." Blair then tightened the handcuffs to the "crushing point."

Correctional Officer Williford, who had responded to the 10-5 call, began leading Santiago to the medical unit, which was standard procedure prior to placing an inmate in administrative segregation. Williford began digging his fingers into Santiago's left arm, prompting Santiago to yell at Williford to stop "manhandling" him. Williford replied, "What are you going to do about it tough guy?" Santiago responded, "I'm not going to let you blow me no more." Williford immediately swung Santiago toward the wall, slamming the right side of his face and body into the wall. Correctional Officer Fox, who had also responded to the 10-5 call, sprayed Santiago with pepper spray. Santiago alleges that although he shifted his body to avoid directly hitting the wall, he did not attempt to escape Williford's grasp or resist in any fashion.

The correctional officers then threw Santiago to the floor and restrained his legs. Correctional Officer Parsons grabbed Santiago's legs, crossed them at the ankles and turned them upward in a torque position, holding them tightly until another correctional officer secured Santiago with leg restraints. Santiago again alleges that he was not resisting the correctional officers' actions. As Santiago was being lifted from the floor, Parsons took his left wrist and turned it upward with a sharp motion, dislocating it.

Parsons led Santiago to the medical unit, where he was seen by a nurse. The nurse asked Parsons whether Santiago's handcuffs could be loosened. Santiago alleges that he heard Captain Branch respond, "No, he's fine." The nurse treated Santiago for a laceration on his left wrist. Santiago alleges that he complained to the nurse about his dislocated left wrist, but the nurse did nothing to address it. The medical records from Santiago's visit do not indicate any complaint regarding a dislocated wrist. The nurse told Parsons and Branch that Santiago would need to take a shower to wash the pepper spray from his hair and face. Branch responded, "Leave him, maybe he'll think twice before threatening one of us." Santiago was forced to wait thirty-five minutes before being placed in a shower.

Following his treatment in the medical unit, Santiago was placed in administrative segregation in House 1. Several hours later, Santiago made a self-declared medical emergency call to have a nurse examine his wrist. The responding nurse was the same person who had treated Santiago earlier. Santiago told the nurse that he thought his wrist might be broken. The nurse looked at his wrist, responded, "it don't look broke to me," and walked away from the cell. Thereafter, Santiago reset his wrist himself, using his sock and the handicap bar in his cell.

Santiago filed a grievance on November 5, 2008, alleging that the correctional officers had used excessive force during the incident in question. This grievance was denied, and Santiago's appeal from the denial was found to be without merit on February 19, 2009. During the grievance process, Santiago remained in administrative segregation. Santiago alleges that on February 22, 2009, Correctional Officer Clubbs spoke to him about his excessive force grievance, telling Santiago that he "would be smart to just drop it." When Santiago responded that he would not drop the issue, Clubbs told him "if you know what is good for you, you will leave Lieutenant Blair out of it." Clubbs continued, saying, "maybe a couple more years in the hole will knock that tough ass attitude out of you, I can make that happen or maybe we'll find you hanging in one of these cells." Clubbs began laughing and then said, "think about it."

Several days later, Clubbs noticed that Santiago had placed a sheet in the crack of his cell door. Clubbs attempted to pull the sheet through the door but was unable to do so because Santiago had tied a knot at the end of it. Santiago pulled the sheet back into his cell and refused to give it to Clubbs. During this exchange, the metal food flap on the cell door was knocked off and struck Clubbs's hand. Santiago was given a conduct violation for this incident and was moved to a different administrative segregation cell without his personal property. This cell did not have a mattress, working sink, or working toilet. Santiago was given a single sheet and was left wearing only his boxer shorts. When Santiago protested the conditions and

asked why he was being treated this way, he was told that it was "per Lieutenant Blair" and until he "learned how to act" he would not receive his property or better living conditions. Later that afternoon, Santiago received the paper work for his conduct violation. Approximately twenty minutes later, Clubbs stopped by his new cell and said, "I told you," and "the next paper work is for your suicide."

The following day, another correctional officer asked Santiago why he had been moved to the new cell. Santiago explained that he had been subjected to an excessive use of force, filed a grievance, and refused to drop the grievance after being threatened by Clubbs, all of which resulted in what Santiago believed was retaliation in the form of an unfounded conduct violation and his transfer to his current cell. When he finished telling the correctional officer this story, the officer stepped aside, shaking his head. Blair stepped into view, saying, "you just ain't going to learn." He then told Santiago that "things are going to get worse." The next day, however, Santiago was moved back to House 1 and placed in a close observation cell. One week later, Santiago appeared before a disciplinary action board for a hearing on the conduct violation issued by Clubbs. The violation was upheld and Santiago received additional time in administrative segregation.

Santiago filed the instant action against the Correctional Officers in their official and individual capacities under 42 U.S.C. § 1983, alleging excessive force and deliberate indifference to his medical needs in violation of the Eighth Amendment and retaliation in violation of the First Amendment. The Correctional Officers moved for summary judgment, contending that they were entitled to sovereign immunity regarding the official capacity claims and qualified immunity regarding the individual capacity claims. The district court granted summary judgment to the Correctional Officers with respect to the official capacity claims, but denied summary judgment with respect to the individual capacity claims.

## II. Discussion

We review *de novo* a district court's denial of a motion for summary judgment based on qualified immunity. Akins v. Epperly, 588 F.3d 1178, 1182 (8th Cir. 2009). "We view the facts in the light most favorable to the plaintiff, accepting as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed." Brown, 574 F.3d at 496.

Determining the question of qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001), *overruled in part by* Pearson v. Callahan, 555 U.S. 223, 236 (2009) (holding that Saucier's two-step sequence is not mandatory). "Under the rule established in Pearson, we have the discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" Fields v. Abbott, 652 F.3d 886, 890 (8th Cir. 2011) (quoting Pearson, 555 U.S. at 236).

### A. Excessive Force

When confronted with a claim of excessive force alleging a violation of the Eighth Amendment, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992) (citing Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). "The Supreme Court recently clarified that the extent of any resulting injury, while material to the question of damages and informative as to the likely degree of force applied, is not in and of itself a threshold requirement for proving this type of Eighth Amendment claim." Williams v. Jackson, 600 F.3d 1007, 1012 (8th Cir. 2010) (citing Wilkins v. Gaddy, 559 U.S. 34, 130 S. Ct. 1175, 1178-79 (2010) (per curiam)).

Santiago's amended complaint alleges that Blair, Williford, Fox, and Parsons used excessive force during the July 26, 2008, incident. In addressing Santiago's Eighth Amendment excessive force claim, the district court applied the Fourth Amendment excessive force legal standard. See D. Ct. Order of Nov. 10, 2011, at 24-25 (citing Rohrbough v. Hall, 586 F.3d 582, 585-86 (8th Cir. 2009)). In Johnson v. Bi-State Justice Center/Arkansas Department of Corrections, 12 F.3d 133, 136 (8th Cir. 1993), we held that the district court's use of the incorrect legal standard in its analysis of an inmate's Eighth Amendment excessive force claim was reversible error. Because the inmate had created a prison disturbance requiring some use of force, we remanded the issue for a determination whether the inmate's "testimony, viewed in light of other relevant factors such as the extent of [his] injury and the security threat reasonably perceived by defendants, '[would] support a reliable inference' of an unnecessary and wanton infliction of pain." Id. at 136-37.

Similarly, the record here demonstrates that Santiago failed to appear at work and then threatened "to drop" a correctional officer while assuming a defensive position, an action that necessitated a call for assistance. The correctional officers facing this situation could apply reasonable force to subdue Santiago and move him to administrative segregation. Santiago testified that he voluntarily submitted to being handcuffed and that although he made at least one disparaging remark to Williford, he did not physically resist the correctional officers' actions. As in Johnson, the question that must be answered is whether this testimony, in light of the surrounding circumstances, is sufficient to support an inference of an unnecessary and wanton infliction of pain. This is a question that "must be answered in the first instance by the district court, applying the correct excessive force standard and avoiding the improper resolution of credibility issues." Id. at 137. Accordingly, on remand the district court must address Santiago's excessive force claim in light of the standard set forth in Johnson.

## B. Deliberate Indifference

To establish a claim of deliberate indifference to serious medical needs under § 1983, Santiago must demonstrate that he suffered from an objectively serious medical need and that Branch actually knew of but deliberately disregarded the need. Johnson v. Hamilton, 452 F.3d 967, 972-73 (8th Cir. 2006). A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995) (internal quotation marks and citation omitted).

Santiago's amended complaint alleges that Branch was deliberately indifferent to his serious medical needs with respect to the treatment of his wrist and the delay in permitting him to enter the shower. Branch moved for summary judgment on the deliberate indifference claim, addressing both treatment issues raised by Santiago. The district court denied Branch's motion, finding that genuine disputes of material fact existed that precluded summary judgment. See D. Ct. Order of Nov. 10, 2011, at 25-26. The district court's order did not conduct a separate analysis of each treatment issue, but did discuss both allegations in the facts section of the order. See id. at 15-17.

Branch's appeal focuses solely on the district court's denial of qualified immunity regarding the treatment of Santiago's dislocated wrist. Assuming that Santiago's dislocated wrist was an objectively serious medical need, Branch is still entitled to qualified immunity because there is no evidence in the record that he deliberately disregarded that need. The only allegation regarding this issue is that Branch refused to loosen Santiago's handcuffs. Santiago would have us believe that it was Branch's action that prevented Santiago from receiving treatment on his wrist. The record does not support such a claim, however, for Branch's refusal to loosen the handcuffs did not prevent the nurse from treating the laceration on Santiago's wrist. Further, there is no evidence that the presence or tightness of the handcuffs prevented

the nurse from treating the dislocation, as the nurse reexamined Santiago's uncuffed wrist several hours later and still concluded that it did not warrant further medical treatment. Accordingly, Branch is entitled to qualified immunity regarding this claim of deliberate indifference.[1]

## C. Retaliation

The right to be free from retaliation for availing one's self of the prison grievance process has been clearly established in this circuit for more than twenty years. Nelson v. Shuffman, 603 F.3d 439, 449-50 (8th Cir. 2010). To prevail on a § 1983 claim for retaliation in violation of the First Amendment, Santiago must demonstrate (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004).

Santiago's amended complaint alleges that Clubbs and Blair retaliated against him in violation of the First Amendment for filing and pursuing his excessive force grievance.[2] Clubbs and Blair do not dispute that Santiago's use of the prison grievance process satisfies the first prong under Revels. See Haynes v. Stephenson,

---

[1] Branch did not raise, either in his briefs or at oral argument, the district court's adverse ruling with respect to Santiago's deliberate indifference claim premised on the thirty-five minute delay in taking a decontamination shower. Accordingly, Branch has waived any claim of error regarding the district court's ruling on that claim, see United States v. Maxwell, 643 F.3d 1096, 1103 n.5 (8th Cir. 2011), and we need not address it on appeal.

[2] At oral argument, counsel for Santiago asserted that the claim of retaliation was a general claim brought under the Due Process Clause of the Fourteenth Amendment. Santiago's amended complaint, however, makes clear that he has alleged only a claim for retaliation in violation of the First Amendment.

588 F.3d 1152, 1155-56 (8th Cir. 2009) ("The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." (internal quotation marks and citation omitted)).  We address separately the remaining two prongs with respect to the allegations against Clubbs and Blair.

### i. Clubbs

Santiago alleges that Clubbs subjected him to two adverse actions: first, he threatened Santiago's life and, second, he falsified a conduct violation report. Looking first to the alleged death threats, Santiago has produced evidence that Clubbs made at least two statements implying that if Santiago did not drop his excessive force grievance against Blair, he would be found hanging in his cell and that his death would be made to look like a suicide.

We have long held that "a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures" to sustain a claim of First Amendment retaliation.  Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994). This is true especially when the threats are ones of death or serious harm to an inmate's safety.  See, e.g., Burton v. Livingston, 791 F.2d 97, 100-01 (8th Cir. 1986) (holding that allegations that a prison guard retaliated against a prisoner by terrorizing him with threats of death, if proved, would constitute a violation of the prisoner's First Amendment rights); Cooper v. Schriro, 189 F.3d 781, 784 (8th Cir. 1999) (per curiam) (holding that threats to an inmate's safety after his use of the prison grievance system supported a retaliation claim).

As set forth earlier, under Revels a prisoner must demonstrate not only that a correctional officer took an adverse action, but that the action "would chill a person of ordinary firmness from continuing in the [protected] activity."  382 F.3d at 876. "The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment."  Garcia v. City of Trenton, 348 F.3d

-10-

726, 728 (8th Cir. 2003). We have adopted the "ordinary-firmness" requirement for First Amendment claims of retaliation, see id., and have applied it in the First Amendment prisoner retaliation context, see Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007) (holding that the record contained insufficient evidence that increasing the prisoner's work load would chill a prisoner of ordinary firmness from using the prison grievance process).

The "ordinary-firmness" test is an "objective one, not subjective." Garcia, 348 F.3d at 729. In determining whether threats of death would chill a prisoner of ordinary firmness from using the prison grievance process, "[t]he question is not whether [Santiago himself] was deterred, though how [Santiago] acted might be evidence of what a reasonable [prisoner] would have done." Id. Rather, the test is what a prisoner of ordinary firmness would have done in reaction to the death threats. Id. "Ultimately, this sort of question is usually best left to the judgment of a jury . . . ." Id.

In the circumstances before us, we conclude that a reasonable jury could find that threats of death, issued by a correctional officer tasked with guarding a prisoner's segregated cell, would chill a prisoner of ordinary firmness from engaging in the prison grievance process. See Hill v. Lappin, 630 F.3d 468, 474 (6th Cir. 2010) ("[T]hreats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct."); Van Deelen v. Johnson, 497 F.3d 1151, 1157 (10th Cir. 2007) (holding that the plaintiff's "allegations of physical and verbal intimidation, including a threat by a deputy sheriff to shoot him if he brought any more tax appeals, would surely suffice . . . to chill a person of ordinary firmness from continuing to seek redress for (allegedly) unfair property tax assessments").

Further, there is sufficient evidence of a causal connection between Santiago's use of the grievance process and Clubbs's death threats to satisfy the third Revels prong. To satisfy the causal connection prong, "the plaintiff must show the official

took the adverse action because the plaintiff engaged in the protected speech." Revels, 382 F.3d at 876. The record indicates that Santiago's excessive force grievance was officially denied on January 2, 2009, and that his appeal was denied on February 19, 2009. The conversation during which Clubbs threatened Santiago to drop his claim of excessive force or risk being found hanging in his cell occurred three days later, while Santiago was at a crossroads regarding whether to continue pursuing his claim in the courts. In these circumstances, a reasonable jury could conclude that Clubbs issued the death threats because Santiago had filed and pursued his excessive force grievance. Thus, Clubbs is not entitled to qualified immunity regarding the retaliatory death threats.

Looking next to the allegation that Clubbs filed a false retaliatory conduct violation against Santiago, we conclude that the claim is without merit. "A prisoner has a cause of action when the prisoner alleges that prison officials filed disciplinary charges based upon false allegations against the prisoner in retaliation for the prisoner's participation in grievances against prison officials." Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994). "However, claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008). "Thus, a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." Id. Under this standard, "a report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." Id. at 831. It is undisputed that Clubbs filed a report detailing Santiago's alleged assault and that Santiago was brought before a disciplinary action board for a hearing at which he was found guilty of assault. Accordingly, Santiago's claim of retaliatory discipline fails as a matter of law and Clubbs is entitled to qualified immunity with respect to this alleged retaliatory action.

-12-

## ii. Blair

Santiago alleges that Blair subjected him to two adverse actions: first, he placed Santiago in a cell without his personal property, bedding, running water, or a working toilet and, second, he threatened him with further retaliation. Blair contends that the conditions of Santiago's cell cannot support a cause of action under § 1983 because they did not create an atypical and significant hardship on Santiago as required under Sandin v. Conner, 515 U.S. 472 (1995). Blair misconstrues Santiago's claim. Sandin would be applicable if Santiago were alleging a conditions of confinement claim under the Due Process Clause. Santiago's claim, however, is clearly one for retaliation under the First Amendment, a claim that Sandin specifically left open. See Sandin, 515 U.S. at 487 n.11 ("Prisoners . . . retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available.").

Santiago alleges that following the incidents with Clubbs he was moved to a cell without his personal property, bedding, running water, or a working toilet. He was forced to sleep in this cell with a single blanket, wearing only his boxer shorts. Santiago further alleges that immediately after hearing Santiago complain that he was being retaliated against because of his pursuit of his excessive force grievance, Blair stepped in front of Santiago's cell door, saying, "things are going to get worse." Whether these conditions and this statement are themselves a constitutional violation is irrelevant. A prisoner has the "right under the First Amendment to petition for redress of grievances under a prison's grievance procedures[,]" Nelson, 603 F.3d at 449, and "conduct that retaliates against the exercise of a constitutionally protected right . . . is actionable even if the alleged retaliatory conduct does not itself rise to the level of a constitutional violation[,]" Van Wyhe v. Reisch, 581 F.3d 639, 658 (8th Cir. 2009).

-13-

We have held that deprivations and threats such as those allegedly made by Blair are sufficient to support a First Amendment retaliation claim. See, e.g., Nelson, 603 F.3d at 450 (holding that the plaintiff who allegedly was held in isolation in a structurally unfinished and inadequate ward and deprived of access to legal counsel, mail, family, recreation, and phone calls had demonstrated sufficient deprivations to survive summary judgment on a First Amendment retaliation claim); Cooper, 189 F.3d at 784 (allegation that the correctional officer shut off water for five days because the prisoner used the prison grievance system was sufficient to state a retaliation claim); Burgess, 39 F.3d at 218 (threat made in retaliation for a prisoner's use of the prison grievance system is sufficient to state a First Amendment retaliation claim). A reasonable jury could conclude that Blair's placement of Santiago in a cell without his personal property, proper facilities, bedding, or clothing and Blair's threat that things would get worse, issued after hearing Santiago complain that he was being retaliated against, are adverse actions sufficient to chill a prisoner of ordinary firmness from engaging in the prison grievance process. See Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) (holding that "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates, especially combined with the conditions allegedly present there," would likely deter a prisoner of ordinary firmness from exercising a right to access the courts).

Santiago has also satisfied the causal connection prong regarding the two adverse actions taken by Blair. See Revels, 382 F.3d at 876. When Santiago was first placed in the cell, he asked the correctional officer why he was being placed in a cell without his personal property, proper bedding, a working sink, or a working toilet. The correctional officer responded, "That's per Lieutenant Blair. Until you learn how to act, you're not going to get any of those things." Blair's threat that things would get worse was issued the following day immediately after hearing Santiago complain that his placement in the cell was retaliation for pursuing his grievance. Taken in the light most favorable to Santiago, a reasonable jury could conclude that these facts demonstrate that Blair took the above-described adverse actions because of Santiago's continued use of the prison grievance procedure. Thus, Blair is not entitled to qualified immunity on Santiago's retaliation claim.

-14-

## III. Conclusion

We affirm that portion of the district court's order which denied qualified immunity with respect to Santiago's deliberate indifference claim against Branch for the delay in allowing Santiago to wash off the pepper spray, the retaliation claim against Clubbs for the retaliatory death threats, and the retaliation claim against Blair. We reverse that portion of the district court's order which denied qualified immunity with respect to the excessive force claim against Blair, Williford, Fox, and Parsons, the deliberate indifference claim against Branch for the treatment of Santiago's wrist, and the retaliation claim against Clubbs for filing a false conduct violation.

The case is remanded to the district court for further proceedings in accordance with the views set forth in this opinion.

_____