# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1472

_____

United States of America

*Plaintiff - Appellee*

v.

William Hayward Council

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: November 16, 2016
Filed: June 19, 2017

_____

Before RILEY,[1] Chief Judge, WOLLMAN and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

---

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

William Council pled guilty to being a felon in possession of a firearm, see 18 U.S.C. § 922(g)(1), after the district court[2] denied his motion to suppress evidence. Officers arrested Council without a warrant while he was standing at the doorway of his camper. The officers then used information gathered during that arrest to obtain a search warrant, which allowed them to seize the evidence at issue. On appeal, Council contends the arrest and ensuing search violated his Fourth Amendment rights and the evidence should have been excluded. We find no such constitutional violation, and we affirm.

## I. BACKGROUND

On August 23, 2013, the Callaway County (Arkansas) Sheriff's Department received a call from Andrew Wright about an alleged assault with a firearm. Dispatch relayed the report to Deputy Kevin Foley shortly after 5:00 p.m. Deputy Foley first contacted Wright, who recounted the incident. At about 9:00 that morning, Wright reportedly was driving with a friend, Melanie Miller, when a multi-colored pickup truck pulled in front of their vehicle and attempted to block the road. The driver got out of the truck and pointed a gun—described as a sawed-off shotgun with a handle wrapped in black tape—at Wright and Miller. Wright managed to drive around the truck and escape the situation without further escalation. Deputy Foley then spoke to Miller, who corroborated Wright's story and identified the other driver as Council, a friend who desired a "more serious relationship" with her. Deputy Foley and the Callaway County Sheriff's Department were already familiar with Council from previous criminal complaints made against him by his neighbors, some of which involved violent behavior.

---

[2]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri, adopting the Report and Recommendation of the Honorable Matt J. Whitworth, United States Magistrate Judge for the Western District of Missouri.

Deputy Foley decided to contact Council at his residence, and enlisted Deputy Kirk Blehm to accompany him. Neither officer sought a warrant because it was not their intent to arrest Council or search him or his residence. Their intent merely was to speak with Council, and according to Deputy Blehm, officers in Callaway County "don't usually apply for an arrest warrant for somebody before [officers] talk to them." When Deputies Foley and Blehm arrived at Council's property shortly after 7:00 p.m. they noticed a truck matching the description provided by Wright and Miller. The officers also observed a shell camper sitting on a different pickup truck about 25 to 30 yards from the road, where they presumed Council lived.

Deputy Foley approached the camper, while Deputy Blehm took a position off to one side where he was mostly out of sight. Deputy Foley knocked. Council asked who was there, and Deputy Foley answered "the Sheriff's Department." Deputy Foley could hear movement within the camper, but there was no answer, so he knocked again. Again, Council asked who was there. Deputy Foley responded louder this time and said "Sheriff's department, come to the door." Council opened the outward-swinging door dressed in only his underwear. Behind Council was a blanket hanging from the ceiling and obstructing the officers' view into the camper. According to Deputy Foley, he explained the nature of the Wright and Miller report and his investigation while Council stood "right in the doorway." Council vehemently denied any involvement, claiming he had been sleeping at the time of the encounter. Upon hearing who had made the accusation, Council called Miller a liar, cursed, and said he would "beat her half to death" the next time he saw her. Deputy Foley asked if he could search the camper, but Council told the deputy to "get a warrant."

It was at this moment Deputy Foley decided to arrest Council. He took Council's arm and ordered him to "[s]tep out of the trailer." Council resisted and tried to retreat behind the blanket while repeatedly saying "wait a minute." Already hanging onto Council's arm and believing Council had "immediate access" to a

-3-

shotgun, Deputy Foley crossed the threshold of the camper and tore down the blanket to see what was behind Council. Deputy Blehm rushed to assist Deputy Foley and together they were able to remove Council from the camper. While Deputy Blehm was helping pull Council into the open he was able to see inside the trailer and noticed what appeared to be a black-taped handle of a gun wedged between the bed and a laundry basket in plain view.

As he was being escorted to Deputy Foley's police cruiser, Council asked if he could go back into his camper and get dressed. Deputy Blehm rejected the request, but offered to retrieve a pair of pants and boots for him. Council consented. Deputy Blehm entered the camper, grabbed some clothes, and confirmed the object he had seen was indeed a shotgun with its handle wrapped in black tape. After learning about the gun, Deputy Foley instructed Deputy Blehm to wait at the camper while he went to book Council and procure a search warrant. When Deputy Foley returned with a warrant the officers searched the camper and recovered a sawed-off shotgun loaded with one live round.

On July 30, 2014, a grand jury returned a two-count indictment against Council: one count for being a felon in possession of a firearm, see 18 U.S.C. § 922(g)(1), and one count for possessing an unregistered firearm, see 26 U.S.C. § 5861(d). Council thereafter filed a motion to suppress, arguing the government's evidence was obtained in violation of his Fourth Amendment rights. Both sides presented their arguments and evidence to the magistrate judge at a hearing on December 1, 2014.[3] The magistrate judge suggested the district court deny Council's suppression motion because the "officers effected a valid arrest" and "[t]he search that followed was supported by a valid search warrant," so "[t]he evidence yielded from the execution of the search warrant was not in violation of the defendant's

---

[3]Deputies Foley and Blehm testified on behalf of the government. Council decided not to testify or present any evidence.

constitutional rights." The district court adopted the Report and Recommendation. Council conditionally pled guilty to the felon-in-possession count in exchange for the government dropping the other firearm count. The district court sentenced him to a prison term of 180 months. See 18 U.S.C. § 924(e)(1) (statutory minimum). Council retained his right to challenge the evidentiary ruling, and now appeals. See 28 U.S.C. § 1291 (appellate jurisdiction).

## II.    DISCUSSION

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Several easy-to-recite but sometimes hard-to-apply rules define the scope of this protection and are relevant here. "[T]he warrantless arrest of an individual in a public place upon probable cause d[oes] not violate the Fourth Amendment." United States v. Santana, 427 U.S. 38, 42 (1976) (citing United States v. Watson, 423 U.S. 411, 423 (1976)). Conversely, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 477 (1971)). There are exceptions that allow a warrantless entry into a person's home, such as when officers have probable cause and exigent circumstances exist. See id. at 590. If evidence is obtained in violation of these principles, the general rule is that it must be excluded at trial.[4] See Utah v. Strieff, 579 U.S. ___, ___, 136 S. Ct. 2056, 2061 (2016).

_____

[4]The government makes no argument that any exception to the exclusionary rule—such as the inevitable-discovery doctrine—applies here, so we will not belabor the role of any other exceptions in our Fourth Amendment analysis. See Utah v. Strieff, 579 U.S. ___, ___, 136 S. Ct. 2056, 2061 (2016) (listing exceptions); United States v. Rodriguez, 834 F.3d 937, 941 (8th Cir. 2016) (describing the Leon good-faith exception).

The evidence at issue technically was recovered during a warrant-backed search. But the underlying factual basis for the warrant consisted of information learned while the deputies arrested Council without a warrant, meaning the admissibility of the evidence depends on the constitutionality of the arrest. Council argues the seized evidence is fruit of the proverbial poisonous tree. See id.

In deciding this appeal we must answer three questions: First, did the officers have probable cause to arrest Council? Second, given the lack of a warrant, was Council voluntarily in a public place when the officers began to arrest him? And third, did exigent circumstances justify Deputy Blehm's subsequent entry into Council's residence where he saw the shotgun? If the answer to any of these questions is "no," then the search was invalid and the evidence must be suppressed. The district court answered all three questions in the affirmative and declared the evidence admissible. In answering these questions for ourselves, we review the district court's factual findings for clear error and its legal conclusions de novo. See United States v. Poe, 462 F.3d 997, 999 (8th Cir. 2006) (standard of review).

## A. Arrest

We have little problem concluding the officers had probable cause to arrest Council, and Council all but concedes this point on appeal. When Deputy Foley decided to arrest Council he had received detailed and consistent reports from two witnesses of Council's recent violent conduct, observed a truck on Council's property matching the description from those reports, and listened as Council threatened severe physical violence against Miller. These facts constitute "reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed," and Council's denials do not change the sufficiency of that information.[5] United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001).

---

[5]Whether Deputy Foley had probable cause and could have obtained a warrant before contacting Council has little relevance, because even if such an approach

## B.    Public Place

With that established, we advance to a closer issue: whether Council was in a public place when the officers initiated the arrest, and if so, whether he was there voluntarily.  The district court found, as a factual matter, Council was "at the doorway" of the camper when Deputy Foley seized his arm and ordered him down the stairs.  The parties devote the majority of their briefing to the legal consequences of this finding, namely the impact of Santana and its progeny.  In Santana, police officers arrived at the defendant's residence without a warrant and found her "standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence."  Santana, 427 U.S. at 40 n.1.  The defendant retreated into her house, but the officers followed and apprehended her in possession of marked money and drugs.  See id. at 40-41.  The Supreme Court declared the evidence admissible, concluding the defendant was in a "public place"—that is, "not in an area where she had any expectation of privacy"—and therefore the Fourth Amendment was not implicated when the officers first sought to arrest her.[6]  Id. at 42-43 (citing Katz v. United States, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.")).

Council acknowledges "[a] doorway of a person's home can become a public place," but claims the situation here "is not factually identical to *Santana*" and is instead more analogous to our decisions in Duncan v. Storie, 869 F.2d 1100 (8th Cir. 1989), and Mitchell v. Shearer, 729 F.3d 1070 (8th Cir. 2013).  In Duncan, the

---

sometimes might be "wise" the Supreme Court has "decline[d] to transform this judicial preference into a constitutional rule."  Watson, 423 U.S. at 423; see Mitchell v. Shearrer, 729 F.3d 1070, 1075 (8th Cir. 2013).

[6]The Supreme Court went on to find exigent circumstances justified the officers' entrance into the defendant's home, namely that they were in "'hot pursuit'" and risked the defendant destroying evidence if they did not follow.  Id. at 42-43.

plaintiff filed a § 1983 action against two officers after he was arrested without a warrant while at his home. See Duncan, 869 F.2d at 1101. The officers claimed the plaintiff had "stepped outside onto the porch" when they decided to arrest him, meaning he was in a public place and not privy to Fourth Amendment protections. Id. at 1101-02. The plaintiff had a different story, testifying he "remained inside his front door" and in fact had "attempted to close the door" before the officers initiated the arrest. Id. at 1101. Given these competing narratives and our obligation to view the facts in the light most favorable to the plaintiff, we denied the officers summary judgment because "[a] jury could find that [the plaintiff's] attempt to retreat, much like the suspect's retreat in *Santana*, placed him firmly inside his home." Id. at 1103. We encountered a similar situation and reached the same conclusion in Mitchell, 729 F.3d at 1074-76. There, the plaintiff maintained he was "inside the house" when officers prevented him from closing the door and pulled him outside to arrest him. Id. at 1072, 1075. Noting the similarities to Duncan, we denied qualified immunity because "a jury could find that [the plaintiff] was within his home—standing far enough away from the threshold to allow the interior door to swing mostly shut and maintaining a reasonable expectation of privacy—when [the officer] began to effectuate the arrest." Id. at 1075-76.

Council's attempt to invoke our reasoning in Duncan and Mitchell is akin to trying to fit a square peg in a round hole. That is, those cases came to us as interlocutory appeals in 42 U.S.C. § 1983 cases so we decided all factual disputes in favor of the plaintiff; on the other hand, here the district court has made the critical factual findings—Council was "in the doorway" and had not yet pulled back when Deputy Foley first seized his arm to arrest him. These findings were not clearly erroneous. Deputy Foley testified Council was "[d]ead even with the doorway" such that he was "halfway in, halfway out." Deputy Blehm stated Council was in the "threshold" of the door. Council offered no conflicting account of his own. Compare Santana, 427 U.S. at 40 & n.1, with Duncan, 869 F.2d at 1103; Mitchell, 729 F.3d at 1075.

Lest we become too "preoccupied with the exact location of the individual in relation to the doorway," we make clear our general conclusion that Council forfeited any "reasonable expectation of privacy" during the exchange. Duncan, 869 F.2d at 1102. When Council appeared at his doorway, he was "not merely visible to the public, but was as exposed to public view, speech, hearing, and touch as if []he had been standing completely outside [his] house." Santana, 427 U.S. at 42. This is supported by Deputy Blehm's testimony that he could still see and hear Council even though this deputy "pretty much stayed out of view" at the side of the camper and was not involved in the initial interaction. Council was in a public place when Deputy Foley began to arrest him.[7]

But that is not enough to end our second inquiry—Council must have come to that public place voluntarily, without coercion or deceit. See Duncan, 869 F.2d at 1102 ("[A]n individual who is compelled to stand in a doorway cannot be lawfully arrested without the existence of probable cause and exigent circumstances. The same standard applies when officers deceive an individual." (citations omitted)). The district court found the evidence did not "support[] a finding that the defendant came to be at his doorway as a result of either coercion or deceit on the part of the deputies," and thus concluded Council "voluntarily came to his doorway." This is a factual determination we review for clear error based on the totality of the circumstances. See United States v. Quintero, 648 F.3d 660, 665-66 (8th Cir. 2011).

We see no clear error. At oral argument, Council tried to compare the facts here to those in United States v. Conner, 127 F.3d 663 (8th Cir. 1997). In Conner, two detectives noticed a car they believed was involved in a burglary they were investigating parked outside a motel room. See id. at 665. The detectives called for

---

[7]Contrary to Council's suggestion, the fact Deputy Foley never said "You're under arrest" is inconsequential. A seizure does not require any magic words, rather physical force can suffice. See United States v. Cook, 842 F.3d 597, 600 (8th Cir. 2016). Council was seized when Deputy Foley grabbed his arm.

backup, and soon a team of six officers had the room surrounded. See id. The officers "knocked on the door longer and more vigorously than would an ordinary member of the public" while "shout[ing], 'Open up,' in a voice loud enough to be heard by a motel resident two rooms away" and another guest in her room. Id. at 665, 666 n.2. At least one officer drew his weapon. See id. at 665. This commotion went on for several minutes without any response from inside, until one of the defendants "looked out the window to assess the forces" and finally opened the door. Id. at 666 n.2. We found no clear error in the district court's conclusion that the defendant did not voluntarily consent to the officers entering the motel room, and allowed entry "in response to a demand under color of authority." Id. at 666; cf. United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011) ("The 'ultimate question' is whether the individual's 'will ha[s] been overborne and his capacity for self-determination critically impaired,' such that his consent to search must have been involuntary." (alteration in original) (quoting United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006))).

Those are not the circumstances here. To begin, our analytical starting place is different because in this case, unlike in Conner, the district court found Council did come to the door voluntarily. This is an important legal distinction. And, although there are some factual similarities, there are also significant dissimilarities. In this case only two officers approached Council's residence during normal waking hours to conduct a "knock and talk," a common information gathering method. They conveyed no intent to apprehend Council on the spot. Deputy Foley knocked twice, identifying himself as a police officer and saying "come to the door" only after being asked who was there. Only one deputy was visible to Council. There is no indication this back-and-forth took several minutes to unfold or was extraordinarily loud, or that the officers ever unholstered their firearms in a display of force. Council could have ignored the request to come to the door or told the officers to go away, just as he later withheld consent to a search.

The other cases Council cites are even more inapposite. See, e.g., United States v. Al-Azzawy, 784 F.2d 890, 893 (9th Cir. 1985) (finding "the officers' show of force and authority was overwhelming" and amounted to "extreme coercion" where officers surrounded the defendant's trailer with their weapons drawn and used a bullhorn to demand he come out and get on his knees). No doubt there is a line where officers' actions are coercive enough that compliance can no longer be deemed voluntary, yet we are not convinced that line was crossed here. The district court found Council came to stand in the doorway of his trailer residence voluntarily, and we cannot say this factual determination was clearly erroneous. Therefore, Council's Fourth Amendment rights were not violated when the officers first sought to arrest him. See, e.g., United States v. Deanda, 73 F.3d 825, 825-26 (8th Cir. 1996).

## C.     Entry

The "only remaining question" is whether Council "could thwart an otherwise proper arrest" by retreating into his home after Deputy Foley seized his arm. Santana, 427 U.S. at 42. Put differently, did exigent circumstances justify the officers' warrantless entry into Council's camper that ultimately allowed Deputy Blehm to see the shotgun in plain view? "Exigent circumstances exist if an objectively reasonable officer on the scene would have sufficient grounds to believe an exigency existed." Poe, 462 F.3d at 1000. The district court found Deputies Foley and Blehm had a "legitimate concern for their safety," which "may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm." Id.; accord United States v. Hill, 430 F.3d 939, 941 (8th Cir. 2005); cf. Duncan, 869 F.2d at 1102 n.3 (listing factors for assessing exigent circumstances).

A number of facts support this conclusion. The underlying incident involved a firearm. The deputies were aware of prior criminal complaints against Council, some of which alleged violent conduct. As declared by the district court, Council was "uncooperative, appeared angry, and made a threat toward another person" when Deputy Foley informed him of the investigation. Most notably, Council resisted

arrest and attempted to retreat behind the blanket and out of view, thereby escalating what had already become a tense situation. When faced with circumstances like these, it is reasonable for officers to believe a gun might be within reach, and they reasonably may fear for their safety. It was reasonable for the deputies to enter the residence to complete the arrest and subdue the security risk.

Council argues the officers "should have . . . anticipated" any exigency arising from the likely presence of a gun, and offers United States v. Houle, 603 F.2d 1297 (8th Cir. 1979), in support of this proposition. The defendant in Houle threatened to shoot a woman and then called to tell the police "he would shoot any officer who came into his yard." Id. at 1298. The officers waited four hours to approach him, but made no attempt to obtain a warrant during this time even though it was their intent to arrest him at his house. See id. When the officers arrived they found the defendant sleeping five or six feet away from a rifle. See id. After reaching through a broken window to remove the gun, the officers kicked down the door and arrested the defendant in his home. See id. We ruled the evidence inadmissible in part because "[a]ny exigency that arose by virtue of the presence of the rifle near the bed could have been anticipated by the officers and does not excuse their earlier failure to obtain a warrant." Id. at 1300. Aside from the many factual differences, reading Houle as creating a rule against finding an exigency when officers knew in advance that weapons may be nearby is to stretch Houle's reasoning too far—in fact, such danger awareness often is considered to support a finding of exigent circumstances. See, e.g., Hill, 430 F.3d at 941-42 (deeming "the violent crime for which [the defendant] was being arrested and the likely presence of weapons," both of which were facts the officers knew or assumed prior to confronting the defendant, contributed to the officers' reasonable fear for their safety); United States v. Vance, 53 F.3d 220, 222 (8th Cir. 1995) (finding fear for officer safety constituted an exigent circumstance *because* "officers had been informed that there were other individuals and weapons in the house").

## III.   CONCLUSION

In sum, the deputies executed a lawful arrest—the officers had probable cause, initiated the arrest while Council voluntarily was in a public place, and entered the camper when they reasonably feared for their safety.[8]   While all of this was happening, Deputy Blehm noticed a shotgun in plain view matching the description he had been provided.  Deputy Blehm conveyed that observation to Deputy Foley, who used the information as the basis for a search warrant.  Had a warrant been obtained earlier this appeal likely would have been avoided.  See Watson, 423 U.S. at 423.  Yet the lack of a warrant did not result in any constitutional infirmities given the way events transpired, as found by the district court with no clear error.  The evidence was admissible.

We affirm.

_____

---

[8]Because the district court found a legitimate fear for officer safety, it did not address whether the "hot pursuit" exigency justified the officers' entry.  Because we find no clear error in the district court's findings and agree as to its first conclusion, we also refrain from addressing the second proffered justification.